IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE:<br>MARCELO D'AMICO,<br><br>       Debtor. | §<br>§<br>§<br>§ | BANKRUPTCY NO. 12-38036-H2-7 |
| NEVADA PROPERTY 1 LLC d/b/a<br>COSMOPOLITAN OF LAS VEGAS,<br><br>       Appellant,<br><br>v.<br><br>MARCELO D'AMICO,<br><br>       Appellee. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-13-3590<br>ADVERSARY NO. 13-03041 |
| DESERT PALACE INC. d/b/a<br>CAESARS PALACE LAS VEGAS,<br><br>       Appellant,<br><br>v.<br><br>MARCELO D'AMICO,<br><br>       Appellee. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-13-3592<br>ADVERSARY NO. 13-03042 |

## MEMORANDUM OPINION AND ORDER

Appellants Nevada Property 1 LLC ("Cosmopolitan") and Desert Palace Inc. ("Caesars") appeal the Bankruptcy Court's November 13, 2013, Memorandum Opinion[1] and Final Judgment.[2]  Pending before the court are the Appellants' Joint Brief on Appeal ("Appellants'

---

[1] Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042.

[2] Docket Entry No. 36 in Adversary No. 13-03041 and Docket Entry No. 34 in Adversary No. 13-03042.

Brief") (Docket Entry No. 5), Appellee, Marcelo D'Amico's Brief
("D'Amico's Brief") (Docket Entry No. 6), Appellants' Joint Reply
Brief on Appeal ("Reply") (Docket Entry No. 7), Appellee, Marcelo
D'Amico's Rejoinder and Motion for Leave ("Rejoinder") (Docket
Entry No. 8), and Appellants' Joint Objection and Response to
Debtor's Rejoinder and Motion for Leave ("Appellants' Joint
Objection and Response") (Docket Entry No. 9).  For the reasons
explained below, the Bankruptcy Court's Final Judgment will be
affirmed.

## I.  <u>Factual and Procedural Background</u>

D'Amico filed for bankruptcy under chapter 7 of the Bankruptcy
Code on November 1, 2012.[3]  Cosmopolitan and Caesars, casinos
operating in Las Vegas, Nevada, filed proofs of claim for $625,000
and $500,000, respectively.[4]  According to the Claims Register, two
other Las Vegas casinos also filed proofs of claim in the
underlying bankruptcy case:  Mirage Hotel/Casino filed a proof of
claim for $500,000 and Wynn Las Vegas, LLC filed a proof of claim
for $700,000.[5]  Each casino's claim relates to gambling losses
incurred during a trip D'Amico took to Las Vegas in May of 2012.[6]

---

[3]Chapter 7 Voluntary Petition, Docket Entry No. 1 in
Bankruptcy No. 12-38036-H2-7.

[4]Southern District of Texas Claims Register, Docket Entry
No. 2-8.

[5]<u>Id.</u>

[6]Appellants' Brief, Docket Entry No. 5, p. 7 ¶ 12, p. 14
¶ 19(D)-(E).

In addition, Orcus Fire Protection, LLC ("Orcus") filed a proof of claim for $1,700,000.[7]  D'Amico is Orcus's president.[8]

D'Amico had been gambling on credit in Las Vegas for approximately eight years before the trip leading to his bankruptcy.[9]  During that time D'Amico had never incurred a derogatory amount at any casino.[10]  In July of 2011 D'Amico applied for a $75,000 line of credit with Cosmopolitan, which was later increased to $250,000.[11]  On May 3, 2012, the line of credit was increased to $500,000.[12]  On May 16, 2012, D'Amico received an additional increase to $625,000.[13]  In May of 2012 D'Amico applied for a $500,000 line of credit with Caesars.[14]  In support of both the Cosmopolitan credit application in July of 2011 and the Caesars

---

[7]Southern District of Texas Claims Register, Docket Entry No. 2-8.

[8]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 4; Appellants' Brief, Docket Entry No. 5, p. 7.

[9]Trial Transcript, Docket Entry No. 2-11, pp. 21:18-22:12.

[10]Id.; ESS-Casino Credit Manual Tracker Sheet, Trial Exhibit 9.

[11]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, pp. 2-3; Cosmopolitan Credit Application, Trial Exhibit 2.

[12]Permanent Credit Line Revision Request, Trial Exhibit 3.

[13]Trial Transcript, Docket Entry No. 2-11, pp. 57:1-59:2; see also id. at 81:10-82:8; Temporary Credit Line Revision Request, Trial Exhibit 4.

[14]Las Vegas Region Casino Credit Application, Trial Exhibit 7.

-3-

credit application in May of 2012, D'Amico listed two corporate bank accounts in Orcus's name.[15]  Testimony at trial established that the balances in these bank accounts, D'Amico's credit score, and D'Amico's gambling history as reported by Central Credit[16] provided the basis for Appellants' decision to extend the lines of credit.[17]

On May 12, 2012, D'Amico deposited $1 million in chips at Caesars.[18]  D'Amico also deposited $500,000 in chips at Cosmopolitan.[19]  On May 17, 2012, D'Amico executed two markers[20] for $250,000 each to Caesars.[21]  D'Amico also executed a marker to Cosmopolitan for $1,175,000, although the record is unclear as to when he did so.[22]  All of the markers were eventually returned

---

[15]Id.; Cosmopolitan Credit Application, Trial Exhibit 2.

[16]Testimony at trial indicated that Central Credit is a "gaming credit bureau" that serves as "a database of all casino credit activity" for the casinos that subscribe to it.  Trial Transcript, Docket Entry No. 2-11, pp. 17:20–18:16.

[17]Id. at 16:18–22:12, 34:19–35:3, 72:24–78:11, 80:21–85:7.

[18]Id. at 30:10–31:6, 37:11–38:17, 61:22–62:9; Caesars Casino Management System Screen Shots, Trial Exhibit 12; see also E-mail Correspondence, Trial Exhibit 27.

[19]Trial Transcript, Docket Entry No. 2-11, pp. 59:16–61:21, 65:4–66:25, 126:10–128:22.  It is unclear from the record when D'Amico made this deposit.

[20]A marker is a counter check that can be drawn on a customer's bank account similar to a personal check.  Id. at 23:15–25.

[21]Casino Statement, Trial Exhibit 10.

[22]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary (continued...)

unpaid when Appellants attempted to draw them against Orcus's bank accounts.[23]

On February 27, 2013, Appellants filed their complaints in the relevant adversary proceedings seeking a determination that their debts were nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(6).[24]  On October 15, 2013, the Bankruptcy Court conducted a joint trial at the request of the parties.[25]  On November 13, 2013, the Bankruptcy Court issued a Memorandum Opinion[26] and Final Judgment[27] discharging D'Amico's debts to Cosmopolitan and Caesars, finding that they had "failed to meet their respective burdens of proof on their claims on nondischargeability."[28]

---

[22](...continued)
No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 10.

[23]Id. at 3-4; Returned Cosmopolitan Marker, Trial Exhibit 6; Caesars Demand Letter, Trial Exhibit 11; June 29, 2012, Amegy Bank Statement, Trial Exhibit 25.

[24]Complaint of Cosmopolitan of Las Vegas to Determine the Dischargability of Certain Debts Pursuant to 11 U.S.C. § 523, Docket Entry No. 1 in Adversary No. 13-03041; Complaint of Caesars Palace to Determine the Dischargability of Certain Debts Pursuant to 11 U.S.C. § 523, Docket Entry No. 1 in Adversary No. 13-03042.

[25]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 7.

[26]Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042.

[27]Docket Entry No. 36 in Adversary No. 13-03041 and Docket Entry No. 34 in Adversary No. 13-03042.

[28]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary (continued...)

On November 25, 2013, Appellants filed their notices of appeal with the Bankruptcy Court.[29]  On January 27, 2014, Appellants filed their Joint Brief on Appeal.[30]  On February 10, 2014, D'Amico filed his responsive brief.[31]  Appellants filed their Joint Reply Brief on February 21, 2014.[32]  D'Amico filed a Rejoinder and Motion for Leave on March 6, 2014.[33]  Appellants filed their Joint Objection and Response to Debtor's Rejoinder and Motion for Leave on March 7, 2014.[34]

## II.  **Standard of Review**

A district court has jurisdiction to hear an appeal from a bankruptcy court's final judgment or order.  28 U.S.C. § 158(a)(1).

---

[28](...continued)
No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 11.

[29]Plaintiff's Notice of Appeal, Docket Entry No. 39 in Adversary No. 13-03041, Plaintiff's Notice of Appeal, Docket Entry No. 37 in Adversary No. 13-03042.

[30]Appellants' Brief, Docket Entry No. 5.

[31]D'Amico's Brief, Docket Entry No. 6.

[32]Reply, Docket Entry No. 7.

[33]Rejoinder, Docket Entry No. 8.

[34]Appellants' Joint Objection and Response, Docket Entry No. 9. Although Appellants oppose D'Amico's Motion for Leave, they also argue that "D'Amico's [c]ontentions in his Rejoinder Brief are either [d]uplicative of his earlier arguments in his Opening Brief or are otherwise [i]ncorrect."  Id. at 3 ¶ 6.  Appellants also fully responded to D'Amico's Rejoinder.  Id. at 3-5 ¶¶ 6-8.  The court therefore concludes that Appellants would not be prejudiced if leave were granted.  Cf. Foman v. Davis, 83 S. Ct. 227, 230 (1962).  Accordingly, D'Amico's Motion for Leave, Docket Entry No. 8, at pages 5-6, is **GRANTED**.

The Bankruptcy Court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. The "clearly erroneous" standard allows this court to reverse the Bankruptcy Court's findings of fact "only if left with 'the definite and firm conviction that a mistake has been committed.'" Perry v. Dearing (In re Perry), 345 F.3d 303, 309 (5th Cir. 2003) (quoting Robertson v. Dennis (In re Dennis), 330 F.3d 696, 701 (5th Cir. 2003)). The Bankruptcy Court's conclusions of law and conclusions on mixed questions of law and fact and application of law to the facts are reviewed de novo. Bass v. Denney (In re Bass), 171 F.3d 1016, 1021 (5th Cir. 1999).

## III. Analysis

Appellants contend that the Bankruptcy Court erred in failing to find their claims nondischargeable under 11 U.S.C. § 523(a)(6).[35] Appellants' arguments concern the following portion of the Bankruptcy Court's Memorandum Opinion of November 13, 2013:

> Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt for the willful and malicious injury by the debtor to another entity or to property of another entity. Raspanti v. Keaty (In re Keaty), 397 F.3d 264, 269 (5th Cir. 2005). An injury is "willful and malicious" where there is either an objective substantial certainty of harm or a subjective motive to cause harm. Id. at 270; Williams v. IBEW Local 520 (In re Williams), 337 F.3d 504, 509 (5th Cir. 2003). The Fifth Circuit has

---

[35]Appellants have not appealed the Bankruptcy Court's determination of dischargeability under 11 U.S.C. § 523(a)(2)(A).

instructed that for a debt to be nondischargeable under
§ 523(a)(6), a debtor must have acted with "objective
substantial certainty or subjective motive" to inflict
injury. <u>Miller v. J.D. Abrams, Inc. (In re Miller)</u>, 156
F.3d 598, 603 (5th Cir. 1998).

At trial, neither Cosmopolitan nor Caesars offered
any competent evidence or advanced any legitimate theory
to a finding under § 523(a)(6). In their post-trial
briefs, Cosmopolitan and Caesars assert that
"circumstantial evidence, consisting of the transactions
within and balances of D'Amico's checking accounts,
coupled with his course of obtaining large initial credit
lines and increasing them, at other casinos during the
time period in question, permits a conclusion that
D'Amico made his false representations under
circumstances that created an objectively substantial
certainty of harm to [Cosmopolitan] [Caesars]." This
argument belies the record. Both Cosmopolitan and
Caesars adduced testimony that they rely on third party
data services to provide the information they use to make
their credit decisions and that the balances in the Orcus
accounts combined with the deposits provided am[p]le
coverage for the extended credit. In failing to call the
Debtor as a witness, the record is devoid of any possible
inference of the Debtor's intentions or actions. The
record further creates questions regarding the legitimacy
of the demands for payment made by Cosmopolitan and
Caesars upon the Debtor. While the business practices of
Cosmopolitan and Caesars could be legitimately
questioned, the issue before the Court is whether the
Debtor caused a willful and malicious injury. The record
presented to the Court contains no legal or factual basis
for such a finding. The Court must therefore find that
both Cosmopolitan and Caesars failed to meet their burden
of proof under 11 U.S.C. § 523(a)(6). The Court will
enter judgment in favor of the Debtor on the claims
asserted under 11 U.S.C. § 523(a)(6).[36]

Appellants argue that the Bankruptcy Court erred by "failing to

find that the preponderance of the evidence established an

---

[36]<u>In re D'Amico</u>, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr.
S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary
No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042,
p. 9.

objective substantial certainty of harm arising from D'Amico's conduct." and by "including a 'reliance' requirement for [their] claim[s] for relief under Bankruptcy Code § 523(a)(6)."[37]

**A.   The Bankruptcy Court did not err in finding that Appellants failed to prove an objective substantial certainty of harm by a preponderance of the evidence.**

"The discharge exceptions are to be narrowly construed in favor of the debtor since the aim of the Bankruptcy Code is to give the debtor a fresh start." <u>Miller</u>, 156 F.3d at 602.  "To prevail under § 523(a)(6), a creditor must prove by a preponderance of the evidence that the debt is not dischargeable." <u>Keaty</u>, 397 F.3d at 270.

### 1.   <u>Applicable Law</u>

"Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt incurred for willful and malicious injury by the debtor to another entity." <u>Keaty</u>, 397 F.3d at 269.  "'[W]illful and malicious injury' is a unitary concept entailing a single two-pronged test . . . ." <u>Miller</u>, 156 F.3d at 603.  "The test for willful and malicious injury under Section 523(a)(6) . . . is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." <u>Williams</u>, 337 F.3d at 509 (quoting <u>Miller</u>, 156 F.3d at 606; <u>accord</u> <u>Goaz v. Rolex Watch U.S.A.</u>

---

[37]Appellants' Brief, Docket Entry No. 5, p. 5 ¶ 6.

(In re Goaz), No. 13-10282, 2014 WL 1047020, at *3 (5th Cir. Mar. 19, 2014).  "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so by determining whether '[the debtor's] actions were at least substantially certain to result in injury.'" Berry v. Vollbracht (In re Vollbracht), 276 F. App'x 360, 361–62 (5th Cir. 2007); accord Red v. Baum (In re Red), 96 F. App'x 229, 231 (5th Cir. 2004); see also Texas v. Walker, 142 F.3d 813, 823 (5th Cir. 1998) ("'[I]ntent to injure may be established by a showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury.'" (quoting Corley v. Delaney (In re Delaney), 97 F.3d 800, 802 (5th Cir. 1996) (per curiam))).

The debtor's subjective motive to cause harm, however, is a question of fact reviewed under the clearly erroneous standard. See Kungys v. United States, 108 S. Ct. 1537, 1552 (1988) (identifying "subjective intent" as a "question of fact" that "must be resolved by the trier of fact"); Pullman-Standard v. Swint, 102 S. Ct. 1781, 1790 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace."); Sears, Roebuck & Co. v. Boydston (In re Boydston), 520 F.2d 1098 (5th Cir. 1975) (applying the clearly erroneous standard to a bankruptcy court's determination of subjective intent).  On the other hand, the Fifth Circuit has tended to treat the inquiry of whether there exists an

-10-

objective substantial certainty of harm as a question of law to be reviewed <u>de novo</u>.  <u>See</u> <u>Vollbracht</u>, 276 F. App'x at 362 ("[T]he courts seemingly did not apply the objective test.  To the extent they did -- concluding, as a matter of law, that Vollbracht's intentional punches were not objectively, substantially certain to cause harm -- we disagree."); <u>Red</u>, 96 F. App'x at 230-32 (treating the Bankruptcy Court's finding that the debtor intentionally drove his car into a crowded bar as a finding of fact subject to the clearly erroneous standard of review, but addressing the issue of objective substantial certainty of harm <u>de novo</u> "[u]nder the facts that the bankruptcy court found"); <u>U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)</u>, 348 F.3d 89, 91 (5th Cir. 2003) ("[T]his court has held that determining dischargeability of a debt arising from a willful and malicious injury under 11 U.S.C. § 523(a)(6) is a question of law subject to de novo review." (citing <u>Williams</u>, 337 F.3d at 508)); <u>Williams</u>, 337 F.3d at 511-13 (applying the clearly erroneous standard to the bankruptcy court's finding of a lack of subjective intent to violate a court order, but reviewing the issue of objective substantial certainty <u>de novo</u>).  <u>But see</u> <u>Shankle v. Shankle (In re Shankle)</u>, No. 13-60251, 2014 WL 486208, at *2-3 (concluding that the appellant "failed to show that the bankruptcy court clearly erred in concluding that his repeated failure to tender to [his ex-wife] her half of the marital asse[ts] constituted a 'willful and malicious' injury").

-11-

2.   Application of Law to the Facts

Appellants argue that the Bankruptcy Court erred "[b]y considering only the absence of direct evidence of D'Amico's subjective intent" and that it "improperly failed to consider the circumstantial evidence that established an objective substantial certainty of harm to the casinos."[38]   Thus, Appellants argue that the Bankruptcy Court either failed to apply or misapplied the Fifth Circuit's objective test for willful and malicious injury under § 523(a)(6).   See Vollbracht, 276 F. App'x at 362.   Regarding objective substantial certainty, Appellants contend that

> [e]ach portion of the objective intent prong is significant.   "Objective" contrasts with "subjective," and requires an evaluation of all of the evidence from the perspective of what an actor would reasonably expect to result from his action or failure to act.   The "certainty" of the harm is only required to be "substantial," and not "absolutely" certain to occur.[39]

Appellants argue that the Bankruptcy Court erred by focusing on D'Amico's subjective intent to the exclusion of any determination of whether harm was objectively substantially certain and that the evidence "not merely permit[s], but require[s], a finding of actionable intent by D'Amico"[40] even if the harm was not "absolutely certain" to occur.   The court will address each contention in turn.

---

[38]Appellants' Brief, Docket Entry No. 5, p. 8 ¶ 15.   Appellants have not argued that the Bankruptcy Court erred in finding that Appellants failed to establish a subjective intent to harm by a preponderance of the evidence.

[39]Reply, Docket Entry No. 7, p. 10 ¶ 13.

[40]Appellants' Brief, Docket Entry No. 5, p. 13 ¶ 19.

       (a)   The Objective Aspect of the Test As Applied to the Evidence

An objective test requires an assessment of all of the relevant facts and circumstances. One fact that often proves determinative in applying the objective test under § 523(a)(6) is the debtor's knowledge at the time of the injury-producing act. See, e.g., In re Williams, 337 F.3d 504 (5th Cir. 2003); Texas v. Walker, 142 F.3d 813 (5th Cir. 1998). In Walker a faculty member at the University of Texas Health Science Center at Houston ("UTHSC") executed a contract with his employer that required him to remit all professional fees he earned to the University of Texas. 142 F.3d at 815. Although he "received substantial fees for court appearances, depositions, and legal consultations," the faculty member "never remitted any of them to the University." Id. Furthermore, the faculty member "admit[ted] that he acted intentionally when he kept the professional fees." Id. at 824. After the faculty member received a discharge in bankruptcy, the State of Texas filed suit against him alleging conversion and breach of contract with regard to the professional fees. Id. at 815. The district court granted partial summary judgment to the faculty member, holding that the "retention of his professional fees was an 'innocent and technical' act rather than a 'willful and malicious injury.'" Id. at 815, 824.

The Fifth Circuit reversed, holding that "[a]n issue of fact exist[ed] regarding whether [the faculty member] was aware of his

obligations to the University under the [contract] and nonetheless knowingly kept his professional fees with the intent of depriving the University of money owed to it." Id. at 824. Although the contract language was "crystal clear," the faculty member claimed that he did not read it until after his bankruptcy filing and that it was "the general belief among UTHSC faculty members . . . that professional fees earned for legal consulting need not be remitted to the University." Id. The Fifth Circuit determined that "what [the faculty member] knew regarding his obligations under the [contract] and when he knew it [were] disputed" and that "[i]f a factfinder were to decide that [he] knew of his obligations under the [contract], then it might also find that [he] knowingly retained his professional fees in violation of the [contract], an act which he knew would necessarily cause the University's injury." Id.

Similarly, in Williams dischargeability under § 523(a)(6) depended upon the debtor's knowledge at the time of the act that caused the injury. In Williams an electrical contractor entered into a collective bargaining agreement ("CBA") with the International Brotherhood of Electrical Workers Local 520 ("the Union"). 337 F.3d at 506. Under the CBA the contractor "agreed to use the Union hiring hall as 'the sole and exclusive source of referral of applicants for employment.'" Id. at 507. After having problems with the Union electricians, however, the contractor hired non-union electricians to complete a large commercial project for

-14-

Eckerd.  Id. at 506-07.  The Union initiated a grievance against the contractor, which "was resolved when the parties entered an Agreed Final Judgment and Decree" under which the contractor "was obligated to hire electricians for commercial projects exclusively through the Union" and to pay restitution of wages and benefits in the amount of $155,855.39 for past violations of the CBA.  Id. at 507.  The contractor subsequently hired non-union electricians for two more commercial projects.  Id.  The contractor was held in contempt and ordered to pay restitution in the amount of $106,911.43 for violating the Agreed Judgment.  Id.

Looking to the contractor's subjective intent, the Fifth Circuit noted that "when [the contractor] hired non-union electricians in violation of the CBA, he was motivated by a desire to complete the Eckerd project and to save his business.  Although [he] acted intentionally, he did not intend to injure the Union." Id. at 510.  With regard to the objective test, however, the court noted that "[w]hether [the contractor's] knowing breach of the CBA was substantially certain to injure the Union is a more difficult call."  Id.  After concluding that "[t]he only direct injuries to the Union were to its prestige and to its ability to uphold its contracts" the court found "no indication in the record that [the contractor], by breaching the CBA, was substantially certain the Union would sustain a blow to its prestige and its ability to uphold its contracts."  Id. at 511.  The court further noted that in order for injuries resulting from a knowing breach of contract

-15-

to be nondischargeable under § 523(a)(6), there must be "explicit evidence that [the] debtor's breach was intended or substantially certain to cause the injury." Id. With regard to the contractor's breach of the Agreed Judgment, however, the court concluded that "[e]ven if [the contractor] did not intend to injure the Union, the Agreed Judgment made him substantially certain that his acts would inflict injury." Id. at 512.

Walker and Williams demonstrate that the debtor's knowledge at the time of the act that caused the injury is an important consideration in assessing whether the injury was objectively substantially certain to result from the debtor's actions. Accord In re Miller, 156 F.3d at 606 (noting that "those who have acted under 'an honest but mistaken belief' . . . cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of 'not substantially certain to result,' in the absence of the fact about which there has been a mistake'"); cf. In re Goaz, 2014 WL 1047020, at *3 ("[K]nowingly selling merchandise bearing counterfeit trademarks necessarily causes injury to the trademark owners."); Harrison v. Kiwi Servs., Inc. (In re Harrison), 180 F. App'x 485, 488 (5th Cir. 2006) (affirming a holding of non-dischargeability under § 523(a)(6) for a judgment debt resulting from the debtor's use of the creditor's name based on the district court's reasoning that "[the debtor] had been implicitly advised through the issuance of an injunction that

-16-

continued use of the [creditor's] name would cause injury to [the creditor]").

Appellants provided no "explicit evidence" of D'Amico's knowledge at the time he applied for credit or at the time he signed the markers. See id. at 511. In addressing the objective test the Bankruptcy Court found that "[b]oth Cosmopolitan and Caesars adduced testimony that they rely on third party data services to provide the information they use to make their credit decisions and that the balances in the Orcus accounts combined with the deposits provided am[p]le coverage for the extended credit."[41] Because the Appellants relied solely on third-party information, the record is devoid of evidence of D'Amico's personal knowledge of the balances in the relevant bank accounts, the amount of any gambling winnings or losses, or his true financial condition at the time that he signed the markers.

The evidence presented to the Bankruptcy Court indicated that D'Amico applied for and received credit lines at several casinos based on his eight-year history of gambling on credit, his credit score, and the balances in his bank accounts.[42]   He planned on "wiring in" to Las Vegas at least $1 million.[43]   He deposited

---

[41]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 9.

[42]Trial Transcript, Docket Entry No. 2-11, pp. 16:18-22:12, 34:19-35:3, 72:24-78:11, 80:21-85:7.

[43]E-mail Correspondence, Trial Exhibit 27.

$1 million in chips at Caesars[44] and $500,000 in chips at Cosmopolitan.[45] He had access to hundreds of thousands of dollars in the relevant bank accounts.[46] From this evidence it is reasonable to conclude that D'Amico had, or believed he had, sufficient funds to pay any gambling debts he incurred through utilization of the various lines of credit he had obtained from the casinos. Indeed, the Bankruptcy Court found that "the balances in the Orcus accounts combined with the deposits provided am[p]le coverage for the extended credit."[47] This conclusion is not clearly erroneous. Cf. LA Capitol Federal Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 322-24 (examining "ability to pay" as a means of establishing a debtor's fraudulent intent under § 523(a)(2)(A) and concluding that inability to pay must be accompanied by proof of the debtor's knowledge of that inability in order to establish fraud).

In order for the Bankruptcy Court to have found that D'Amico's actions were objectively substantially certain to cause harm to

---

[44]Trial Transcript, Docket Entry No. 2-11, pp. 30:10-31:6, 37:11-38:17, 61:22-62:9; Caesars Casino Management System Screen Shots, Trial Exhibit 12; see also E-mail Correspondence, Trial Exhibit 27.

[45]Trial Transcript, Docket Entry No. 2-11, pp. 59:16-61:21, 65:4-66:25, 126:10-128:22.

[46]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, pp. 4-6.

[47]Id. at 9.

Appellants, Appellants had the burden to prove by a preponderance of the evidence that, at the very least, D'Amico knew that he was borrowing more than he could afford to pay back.[48]  Because the evidence at trial established only the Appellants' knowledge of D'Amico's financial position -- knowledge obtained exclusively from third-parties -- the record is devoid of any evidence of D'Amico's knowledge of his financial position at the time he signed the markers.

---

[48]Indeed, a strong argument can be made that in order to find a debt nondischargeable under § 523(a)(6) the evidence must show that the debtor not only had knowledge of the facts and circumstances that would make harm substantially certain to result from his actions, but that he also knew that the harm itself was substantially certain to result. See Harrison, 180 F. App'x at 488 ("[The debtor] had been implicitly advised through the issuance of an injunction that continued use of [the creditor's] name would cause injury to [the creditor]."); Red, 96 F. App'x 229 ("This Court has interpreted 'willful and malicious injury' to mean that the debtor must be aware that the act will result in 'either an objective substantial certainty of harm or a subjective motive to cause harm.'" (quoting Miller, 156 F.3d at 606)); Williams, 337 F.3d at 511 (holding that although a contractor knowingly violated the terms of a CBA, the resulting harm was not willful and malicious until after the entry of an Agreed Judgment with the Union "made [the contractor] substantially certain that his acts would inflict injury"); Walker, 142 F.3d at 824 ("If a factfinder were to decide that [the debtor] knew of his obligations under [the contract,] then it might also find that [the debtor] knowingly retained his professional fees in violation of [the contract], an act which he knew would necessarily cause the University's injury."). One bankruptcy court has even interpreted the objective prong of the Fifth Circuit's "willful and malicious" inquiry as "essentially evidentiary in nature and import, a kind of marker or 'badge of intent,' something akin to a badge of fraud." Mann Bracken, LLP v. Powers (In re Powers), 421 B.R. 326, 334-35 (Bankr. W.D. Tex. 2009); cf. Miller, 156 F.3d at 605-06 (adopting an implied malice standard for the objective inquiry under § 523(a)(6)); Conte v. Gautam (In re Conte), 33 F.3d 303, 308-09 (3d Cir. 1994) (rejecting a special malice standard for willful and malicious injury under § 523(a)(6)).

   (b) Substantial Certainty of Harm Under the Objective
     Test

  Appellants argue that "[t]he 'certainty' of the harm is only
required to be 'substantial,' and not 'absolutely' certain to
occur."[49] The court agrees. Substantial certainty cannot mean
absolute certainty -- "[o]therwise, no acts would meet the
formulation because no act will <u>definitely</u> produce harm -- all
effects are probab[i]listic." <u>Conte</u>, 33 F.3d at 308 n.2, <u>cited in</u>
<u>Delaney</u>, 97 F.3d at 802 n.7.

  In <u>Conte</u> the Third Circuit reached the same conclusion that
the Fifth Circuit reached in <u>Miller</u> that "willful and malicious"
under § 526(a)(6) requires that the debtor act with either
subjective motive or purpose of causing injury or with substantial
certainty of causing injury. <u>Compare</u> <u>Miller</u>, 156 F.3d at 603-06,
<u>with</u> <u>Conte</u>, 33 F.3d at 305-09. The court concluded that
"substantial certainty" required more than a "high probability" of
harm. <u>Conte</u>, 33 F.3d at 307. This is logical because § 523(a)(6)
does not prevent a discharge of debts arising from a debtor's mere
recklessness. <u>Id.</u>; <u>see also</u> <u>Kawaauhau v. Geiger</u>, 118 S. Ct. 974,
977-78 (1998) (holding that "[t]he word 'willful' in (a)(6)
modifies the word 'injury,'" and that "nondischargeability takes a
deliberate or intentional <u>injury</u>, not merely a deliberate or
intentional <u>act</u> that leads to injury"); <u>Miller</u>, 156 F.3d at 603
(noting that "[t]he Supreme Court's disposition in <u>Kawaauhau</u>

---

  [49]Reply, Docket Entry No. 7, p. 10 ¶ 13.

certainly eliminates the possibility that 'willful' encompasses negligence or recklessness").

Analyzing the phrase "deliberate or intentional" in the legislative history of § 523(a)(6), the Third Circuit in <u>Conte</u> noted that "under the common law '[t]he word intent . . . denote[s] that the actor desires to cause the consequences of his act, <u>or</u> that he believes that the consequences are substantially certain to result from it.'"  33 F.3d at 307-08 (quoting Restatement (Second) of Torts § 8A (1979)) (internal quotation marks omitted).

> Intent is not . . . limited to consequences which are desired.  If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.  As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent and becomes mere recklessness . . . .

<u>Id.</u> at 308 (quoting Restatement (Second) of Torts § 8A cmt. b). "For an act to be reckless 'it is enough that [the actor] realizes or, from facts which he knows, <u>should realize</u> that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless.'"  <u>Id.</u> at 307 (quoting Restatement (Second) of Torts § 500, cmt. f (1965)). Substantial certainty therefore requires more than a realization that there is a strong probability that harm may result.

As applied to this case, the issue is therefore whether the probability of harm to Appellants from D'Amico's conduct, in light of all of the relevant facts and circumstances, was so high as to

constitute a substantial certainty rather than mere recklessness. Two Fifth Circuit opinions are illustrative.

In Delaney the debtor "in anticipation of a confrontation and possible fight with [the creditor] loaded his double-barreled shotgun and took it with him to face [the creditor] who remained seated in the car that had stopped in [the debtor's] front driveway." 97 F.3d at 801-02. The creditor "was injured when [the] shotgun, which [the debtor] had intentionally loaded, carried, and aimed at [the creditor] through the car's windshield, went off by accident. The shotgun discharged after [the debtor] -- with his finger on the trigger -- twice tapped the gun barrel on the windshield of the car." Id. at 801. The court noted that the debtor "unquestionably acted intentionally when he loaded the shotgun, took it with him to the confrontation with [the] creditor, and, with his finger on the trigger, twice tapped the barrel of the gun on the windshield of the car to get [the creditor's] attention." Id. at 802. The court also noted, however, that "the firing of the gun was neither deliberate nor intentional; on the contrary, it was wholly unintentional, even though possibly not wholly unforeseeable." Id. at 802-03. Thus, the debtor's subjective intent either to injure or to act in a way that caused the injury was not in dispute. See id. at 801-02. The court concluded that "the injury was not 'willful and malicious' on the part of [the debtor]: He neither intended the injury nor

intentionally took action that was 'substantially certain' to cause the injur[y]." Id. at 803.

In contrast, in Red the creditors were injured when the debtor intentionally drove his car into a crowded bar killing the creditors' relatives. 96 F. App'x at 230. The debtor argued that "the bankruptcy court's finding that he intentionally drove into the bar does not support the legal conclusion that the debts are non-dischargable under § 523(a)(6)" because that finding "does not demonstrate an intent to harm anyone." Id. at 231. The Fifth Circuit noted that "[w]hile the bankruptcy court's finding cannot establish [the debtor's] subjective intent, it does demonstrate an objective substantial certainty of injury." Id. The court distinguished its holding in Delaney, stating that "unlike in Delaney, the bankruptcy court here found that [the debtor] did intentionally commit an action -- driving into a crowded bar -- that was 'substantially certain' to cause harm." Id.

It is not enough that D'Amico acted in a way that caused harm to Appellants -- the probability of harm must have been so great, in light of all of the relevant facts and circumstances, that the harm could be said to have been substantially certain to result. In Delaney the debtor knew that he was going to a confrontation and possible fight, knew that the gun was loaded, deliberately put his finger on the trigger, and intentionally pointed the gun at the creditor. 97 F.3d at 801-02. That the creditor might suffer harm, especially harm from the discharge of the gun, whether subjectively

-23-

intended or not, was certainly foreseeable.   Nonetheless, the probability of harm did not rise to a level that rendered it a substantial certainty.   On the other hand, when the debtor in <u>Red</u> intentionally drove his car into a crowded bar, the probability of harm was so high that no reasonable person could anticipate a sufficiently plausible scenario wherein the debtor's actions would not result in harm to the creditors.   Indeed, the debtor in <u>Red</u> admitted that "if a person were to drive into a crowded restaurant he 'would know that [he] would cause catastrophic injuries or death inside the restaurant.'"   96 F. App'x at 231.

> Appellants argue that
>
> D'Amico requested, and obtained, credit line increases . . . based upon his express and/or implied representations that he would pay what he owed.   During the course of his trip, he dug his hole even deeper.   The final outcome is precisely what could be objectively expected under the circumstances:   the Casinos were harmed due to D'Amico's inability to pay the debt that overwhelmed his ability to pay.[50]

However, whether it could be expected that D'Amico might incur gambling losses and be unable to pay them is not the test.   It could also be expected that if one brings a loaded gun to a confrontation, points it at someone sitting in a car no more than a few feet away, places his finger on the trigger, and uses the gun to tap on the windshield, harm might result.   As acknowledged by the Fifth Circuit in <u>Delaney</u>, the result is not "wholly unforeseeable."   97 F.3d at 802-03.   Similarly, the injuries

---

[50]Reply, Docket Entry No. 7, p. 13 ¶ 18.E.

suffered by Appellants here were not unforeseeable -- they may have even been highly probable.   However, a "high probability is less than substantial certainty."   <u>Conte</u>, 33 F.3d at 307.

There was some discussion at trial about Appellants' failure to establish a time line of events that would allow the Bankruptcy Court to determine which casinos, if any, extended credit to D'Amico at a time when he would have been unable to repay it.[51] Appellants made no effort to establish whether they were the first casinos visited or the last casinos visited.   When D'Amico began gambling it was not objectively substantially certain that harm would result to Appellants.   Indeed, the record suggests that when D'Amico signed the Caesars and Cosmopolitan markers he had at least $1 million in chips and access to several hundred thousand dollars in the relevant bank accounts.   The Bankruptcy Court so found.[52] This finding was not clearly erroneous.   Accordingly, the court is not convinced that the probability of harm was so high as to constitute an objective substantial certainty.

3.   <u>Conclusions</u>

The Bankruptcy Court did not err in finding that Appellants had failed to meet their burden of proving a willful and malicious

---

[51]Trial Transcript, Docket Entry No. 2-11, pp. 142:5-144:23.

[52]<u>In re D'Amico</u>, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 9.

injury by a preponderance of the evidence.  As explained above, the record is devoid of any indication of D'Amico's knowledge of his financial condition at the time that he signed the markers.  In fact, given the substantial sums D'Amico deposited with the casinos and the balances in the relevant bank accounts, it is unclear from the record whether D'Amico was in fact unable to pay the markers when he signed them.  Moreover, Appellants made no effort to establish D'Amico's knowledge to the Bankruptcy Court.  Instead, Appellants argued that harm was objectively substantially certain from the perspective of a reasonable person with perfect or complete knowledge of all of the relevant facts and circumstances.[53] It was Appellants' burden to prove by a preponderance of the evidence that D'Amico possessed the requisite knowledge to make his acts substantially certain to result in injury to the casinos.  The Bankruptcy Court concluded that Appellants had failed to do so. The court agrees.

As explained above, a determination of nondischargeability under § 523(a)(6) requires an assessment of all of the relevant facts and circumstances.  Much of the parties' briefing consists of a discussion of the operative facts of other cases involving the

---

[53]See   Trial   Transcript,   Docket   Entry   No.   2-11, pp. 130:16-145:25;  Post-Trial  Memorandum  Submitted  by  Plaintiff Desert Palace Inc. d/b/a Caesars Palace Las Vegas, Docket Entry No. 30-2 in Adversary No. 13-03042, p. 4; see also Appellants' Brief, Docket Entry No. 5, pp. 13-15 ¶ 19; Reply, Docket Entry No. 7, pp. 10-11 ¶ 14, pp. 13-14 ¶¶ 19-20.

dischargeability of gambling debts.[54]  <u>See, e.g.</u>, <u>AT&T Universal Card Servs. v. Mercer (In re Mercer)</u>, 246 F.3d 391 (5th Cir. 2001) (en banc); <u>Adamar of New Jersey, Inc. v. August (In re August)</u>, 448 B.R. 331 (Bankr. E.D. Pa. 2011); <u>Boyd Gaming Corp. v. Hall (In re Hall)</u>, 228 B.R. 483 (Bankr. M.D. Ga. 1998); <u>Chevy Chase Bank, FSB v. Briese (In re Briese)</u>, 196 B.R. 440 (Bankr. W.D. Wis. 1996); <u>Chase Manhattan Bank v. Murphy (In re Murphy)</u>, 190 B.R. 327 (N.D. Ill. 1995); <u>Trump Plaza Assocs. v. Poskanzer (In re Poskanzer)</u>, 143 B.R. 991 (Bankr. D.N.J. 1992).  Appellants in particular place great emphasis on the facts and reasoning of <u>Poskanzer</u>.[55]  In <u>Poskanzer</u> the debtor "incurred several large gambling debts at various casinos in October of 1990." 143 B.R. at 993.  The debtor had "obtain[ed] hundreds of thousands of dollars in credit based upon records which reflected a bank account which had insufficient funds to repay the obligations that were incurred."  <u>Id.</u> at 999.  Furthermore, "the debtor admitted that he knew at the time he obtained credit from the casinos that the bank account had assets therein which were grossly inadequate to meet his newly incurred casino debts."  <u>Id.</u>  In addition, the debtor "admit[ted] to having

---

[54]<u>See</u> D'Amico's Brief, Docket Entry No. 6, pp. 17-21, 26-28; Reply, Docket Entry No. 7, pp. 6-13.

[55]<u>See</u> Appellants' Brief, Docket Entry No. 5, pp. 11-12 ¶ 17; Reply, Docket Entry No. 7, pp. 12-13 ¶ 18; <u>see also</u> Trial Transcript, Docket Entry No. 2-11, pp. 143:9-144:20; Memorandum of Law Regarding Disputed Legal Issues by Plaintiff Desert Palace Inc. dba Caesars Palace Las Vegas, Docket Entry No. 24 in Adversary No. 13-03042, p. 10.

consulted with attorneys regarding the filing for bankruptcy" and to "having solicited and obtained a bankruptcy petition" before incurring the debts. Id. at 997.  Although the court found the debts nondischargeable under § 523(a)(2)(A), (B), and (C), it expressly found that "the debtor's conduct failed to rise to the level of a 'willful and malicious injury'" for purposes of § 523(a)(6). Id. at 999–1000.  D'Amico's conduct, as reflected in the record, falls short of the egregiousness of the debtor's conduct in Poskanzer.   The court therefore concludes, as the Bankruptcy Court found, that no basis exists for inferring that D'Amico's conduct rises to the level of a willful and malicious injury.

It was Appellants' burden to prove that D'Amico's conduct was objectively substantially certain to cause them harm.   The Bankruptcy Court concluded that Appellants failed to do so.  In light of Appellants' failure to even attempt to establish a time line of events or D'Amico's knowledge at the time of the acts leading to the injury, the court agrees with the Bankruptcy Court's conclusion.

**B.    The Bankruptcy Court did not include a reliance requirement for Appellants' claims under § 523(a)(6).**

Appellants argue that "[t]he Bankruptcy Court committed a reversible error of law by injecting a 'reliance' element as a requirement for the Casinos to obtain relief under Bankruptcy Code

§ 523(a)(6)."[56]   They argue that "[b]y focusing on the information
the Casino[s] <u>relied upon</u> in their 'due diligence' process in
approving D'Amico's credit line, the Bankruptcy Court improperly
ignored the legally operative facts in a § 523(a)(6) case, namely,
D'Amico's course of conduct during his losing gambling spree,
considered within the overall circumstances of the series of
transactions."[57]

D'Amico argues that the Bankruptcy Court "correctly framed the
issue presented under Section 523(a)(6): whether . . . D'Amico
caused a willful and malicious injury" and "correctly determined
that the Casinos failed to present the bankruptcy court with any
factual or legal basis for such a finding and this determination is
supported by the record."[58]   Appellants respond that although the
court "cited proper Fifth Circuit precedent, [it] got 'off track'
and incorrectly injected a reliance element."[59]

The court agrees with D'Amico.  Unlike the Bankruptcy Court's
analysis under § 523(a)(2)(A), which expressly addressed
Appellants' reliance as an element to be proven in order to
establish that the debts are nondischargeable, the Bankruptcy
Court's analysis under § 523(a)(6) did not state that reliance was
an element.   The Bankruptcy Court correctly stated the legal

---

[56]Appellants' Brief, Docket Entry No. 5, p. 6 ¶ 9.

[57]Appellants' Brief, Docket Entry No. 5, p. 8 ¶ 14.

[58]D'Amico's Brief, Docket Entry No. 6, pp. 24-25 ¶ 39.

[59]Reply, Docket Entry No. 7, p. 12 ¶ 17.

standard and concluded that Appellants failed to satisfy their burden of proof. The Bankruptcy Court acknowledged that "[w]hile the business practices of Cosmopolitan and Caesars could be legitimately questioned, the issue before the Court is whether the Debtor caused a willful and malicious injury."[60] Cf. Melancon, 223 B.R. at 333 (asserting that the relevant inquiry for § 523(a) is the debtor's conduct, rather than the creditor's faults).

Moreover, as explained above, the Bankruptcy Court's factual findings regarding Appellants' exclusive reliance on third-party data services and the information they provided were relevant to the court's consideration of all of the facts and circumstances that could support an inference that harm was objectively substantially certain. Accordingly, the Bankruptcy Court did not err in making such factual findings, nor did it err in considering their relevance to the dischargeability of Appellants' claims under § 523(a)(6).

## IV.  Order

For the reasons explained above, the Bankruptcy Court's Final Judgment entered on November 13, 2013, is **AFFIRMED**.

**SIGNED** at Houston, Texas, on this 23rd day of April, 2014.

SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[60]In re D'Amico, No. 12-38036-H2-7, 2013 WL 6045732 (Bankr. S.D. Tex. Nov. 13, 2013), Docket Entry No. 35 in Adversary No. 13-03041 and Docket Entry No. 33 in Adversary No. 13-03042, p. 9.